The next case for argument is 25-1300, Christopher Kohls v. Keith Ellison et al. All right, Mr. Shulman, we'll hear from you when you're ready. Good morning, Your Honors. Adam Shulman for appellants, Franson and Kohls, and I have with me at table Allie Howell from Upper Midwest Law Center for the plaintiffs' appellants as well. If you'll permit me, I'd like to take a minute to situate this case in its historical context. Exactly one century ago this year, the State of Minnesota passed a novel statute that prohibited any publication about public officials that qualified as malicious, scandalous, and defamatory. That statute authorized courts to enjoin such publications as a public nuisance. In a landmark decision, the Supreme Court told Minnesota, no, you can't do that, it's a prior restraint. That was near v. Minnesota, one of the first cases applying the First Amendment to the states. If speech ultimately amounts to defamation, individuals can find their redress in libel law after the fact, but a statute can't, publication can't be restrained by a statute ex ante. Fast forward several decades. Minnesota opened a new front against political speech, this time by a statute that prohibited false speech about candidates. After a lengthy process of litigation and legislative amendments, this court tells Minnesota this time, no, you can't do that, it unconstitutionally abridges political, protected political speech. That was 281 Care Committee. The citizenry, not the government, should be the monitor of falseness in the political arena. Fast forward to the present day. Minnesota has not yielded at all on its crusade against political misinformation, and it hasn't taken heed of 281 Care Committee. Section 609.771 criminalizes political deep fakes that are too realistic. Compounding that constitutional harm, it imposes an unprecedented political penalty for such speech, permanent disqualification from holding public office. Disqualifying citizens from public office if they engage in political speech is quite the opposite of free and fair elections. This court meant what it said in 281 Care Committee. The Constitution doesn't permit restrictions on political speech that perpetuate the very fraud they are allegedly designed to prohibit. Thus, we ask this court to reverse for entry of the injunction the First Amendment requires. I welcome the court's questions. Why didn't you just litigate this case to final judgment? Well, we were... I mean, you tried to get a preliminary injunction. The judge didn't really rule on the merits of the case, and now you've waited 10 months, as I understand it, without pursuing the case in order to appeal these equitable issues. Right. There is a finding that there was no irreparable harm, which would have prevented us from obtaining the injunction we wanted at final judgment as well. Well, it wouldn't. Why would it? Well, an irreparable harm is... You said there was no irreparable harm because of your delay, but that doesn't mean you couldn't get a permanent injunction. But that's a component of the permanent injunction. We state the Amoka case from the Supreme Court. It's also a requirement that you show irreparable harm to entitlement. But when you're seeking this interim relief... Preliminary injunction. ...the issue of delay is more pertinent than if you're seeking a final judgment. Well, there was... I don't know why. I don't know if it's such an urgent matter. I don't know why you didn't just litigate it to final judgment instead of taking all this time on an appeal. Well, we would have... Interim relief. We saw indications in the judge's order that it was thinking about the case from the perspective of a facial remedy being... from the perspective of following Moody rather than 281 Care Committee, if you look at 20 to 22 or 22 to 23 of the order at the end. But we think that this Court could provide guidance. We don't... That's not our job description. We don't do guidance. Well, I mean, there's a question of law, right? The First Amendment issue that we raise is a pure question of law. This Court has said that the irreparable harm analysis is entangled with the likelihood of success on the merits. Sometimes. Sometimes it is, but... Well, in this case, of course, the district court said that independently that there was somehow a delay, which I think we've shown in the briefing that the supposed delay, even if you count it from the statute that's no longer operative, the first version of the statute, we were barely over a year from that period of time, whereas 281 Care Committee was filed four years after... The complaint came four years after the most recent amendment to that statute that was being challenged. The Gartner case was seven years after that statute. Those weren't preliminary relief cases, were they? Those were final judgments. That's correct, Your Honor. That's correct. If I was in Hotchkiss more on point, that was a preliminary relief case. Well, Hotchkiss was about, we read Hotchkiss to be about the harm and the lack thereof in that the plaintiff had moved out of the district, had moved his case. That's true, but there was also discussion about delay and how it factored into the equitable... This is true. Well, the Ninth Circuit's Quivello decision is very good on the issue of delay, and I believe that was in the posture of preliminary injunction to the extent that that's helpful. Did anyone ask to accelerate this motion to the merits? Do you mean expedite the... I mean the very sound provision in Rule 65 that encourages that whenever appropriate. Nobody did ask for that. I think it was, well, from our part, we could... A classic case to do that. From our reading of the opinion is that the district court was thinking about the merits, ultimate merits question of the constitutionality from the wrong perspective, and rather than seeing this as a viewpoint-based law, she saw the challenge as an overbreath challenge where you have to look application by application, but there's no non-speech applications that are even involved in this law. I mean, you're reading a lot into an order that didn't address the merits. Right. You could have given her a chance to decide the case. Well, we said appeal that if you lose on a final judgment. Reading into a preliminary order what she's going to do on a final judgment, I don't know. I don't see how her... You just end up getting more delay. Sorry, Your Honor. I mean, tact... I mean, it's your choice tactically. I'm just... We think that's the problem. If a bare remand from this court results in we're back at square one, where we've been, we filed the motion for injunction promptly. It was delayed a little bit until after the election. We didn't get a ruling. I mean, obviously the... But the merits are going to be alive whatever we do. Yeah. If we affirm. What are you talking about? My concern is the irreparable harm, right? At the summary judgment stage, there's no difference in the court's irreparable harm analysis. If we had proceeded to cross-move for summary judgment, I don't see how we could have overcome that decision. In many election situations, every election moots whatever was before. Of course. It wasn't... I don't read the district court's opinion to be a question of mootness, right? Obviously, she held that one of our clients didn't have standing. We think that was an error. But for the one that she held did have standing, I don't see that moving it to final decision gets you anywhere on the irreparable harm question at all. You may be misinterpreting. I mean, she may be saying when you're seeking this unusual interim preliminary relief and you've delayed, I'm not persuaded that the equities warrant immediate action. But when you get to the final judgment, obviously if there's an infringement on free speech rights, you're harmed. Sure. I'd like to say something about the equities of this court reaching that. Because there was a development that happened, in fact, during the briefing. During our briefing, the X Corporation filed a parallel lawsuit in the District of Minnesota. Who did? X Corporation, Twitter, now known as X Corporation. I have the case number for you. But that was 25-CV-1649. And in docket number 21, the State of Minnesota defendant, Ellison, requested a stay of that action pending this court's adjudication of this appeal. So both sides are hoping we'll give guidance. Exactly. Go ahead. I just think for efficiency's sake. His way to avoid that is nobody had standing. I'm not. It's not a joke. It's not a joke, yeah. Lots of parties think it's more efficient to get the court of appeals. I'm certainly willing to enter. And on incomplete records. Of course. Of course. But I think for reasons that we briefed, standing really is not an object in this pre-enforcement First Amendment posture. This, of course, applies a forgiving test. That test manifests itself in the arguably prescribed standard, which in our view the district court misestimated. You're on dangerous ground to make that assumption it's not a serious issue. Well, I'm happy to entertain questions if the panel has any questions about that. No, it's briefed. It's fully briefed. I'll reserve the rest for rebuttal in that case if there's no questions. Very well. Thank you for your argument. Mr. Farrell, we'll hear from you. Good morning, Your Honors. My name is Pete Farrell, and I represent the Defendant Appali, the Minnesota Attorney General. As this Court's questions have already indicated, this appeal raises a very narrow question, whether Judge Provenzino abused her discretion when she denied the extraordinary remedy of a facial preliminary injunction of Minnesota's electoral deepfake law. This Court should affirm for two main reasons. First, Coles and Franson failed to meet their standing burden at the preliminary injunction stage. And second, even if Franson established standing, she did not show reparable harm because she waited more than 16 months to challenge a law that she originally voted for. But if the Court disagrees with us on either of those points, it should follow its ordinary practice and remand so the District Court can assess likelihood of success on the merits and the rest of the data phase factors. Now, as far as Franson's irreparable harm goes, do you take the position that this delay would mean there would never be irreparable harm, even at a final judgment stage, if she prevailed on the merits? No, Your Honor, and we emphasize that point in our brief. They cite a number of cases for that point that are all permanent injunction cases. There maybe is the Ninth Circuit case that my friend on the other side flagged that maybe that's a preliminary injunction. What was the name of that case? I think it was, I'm going to butcher it, City of Cavallo. I think it's something like that. But in general, they are citing permanent injunction cases. And as we emphasize in our briefing, here the plaintiffs were seeking an extraordinary remedy, which is a facial preliminary injunction of a State statute. And that was front and center for Judge Provenzino. I think you see that throughout her order. She says that a preliminary injunction is very strong medicine. And in looking at the irreparable harm issue, she concluded that on these very unique facts, where Representative Franson was in the Minnesota legislature and voted for the original version of this deepfake law, that it wasn't really, this wasn't an emergency. Counsel, is that a proper basis to make any decision about standing? There are stories of congressmen who always vote one way on an amendment and one way on the bill and one way on this and one way on that. Isn't that as phony as anything can be? I don't think so, Judge Benton, because I think it goes to Judge Provenzino's equitable discretion. I mean, it is a very unique fact pattern we have here, that a legislator who voted for the law that she now says is facially unconstitutional is bringing this type of challenge. And she waited 16-plus months to do so. I think Judge Provenzino is well within her discretion to say, look, if I'm going to conclude that Franson has standing, and I do want to talk about that, but if I'm going to conclude that Franson has standing, there's no emergency here that warrants the extraordinary relief of a facial preliminary injunction. And I don't think there's any basis for this Court to conclude that she abused her discretion on that point. Do you think we have to resolve the injury in fact question and standing? I do think you have to resolve that question. And is that all we have to resolve? That is all you could resolve, yes. Well, I ask a different question. Is that all we have to resolve? If you conclude that there's no standing, then yes, that is all you have to resolve. What if we conclude there's standing? Is that all we have to resolve? And on a preliminary injunction? So if you conclude that there is standing. For both of them, go ahead. For both of them, okay.  So you would, I think then we would be looking at a remand because the district court did not really consider irreparable harm as to Coles. But you would potentially, I think it would be possible for the court to consider whether Franson had satisfied irreparable harm for purposes of a preliminary injunction because the district court did rule on that basis. Thank you. But if I could just take a step back and talk a little bit about standing. I just want to make a few points. So under the Supreme Court's decision in Murphy, the Supreme Court has emphasized that at the preliminary injunction stage, when you are bringing a facial challenge to a law, even in the First Amendment context, facial challenges are disfavored. And you have to make a clear showing of standing. And here the plaintiffs did not make that clear showing. And there's really two reasons. First, the deepfake law categorically does not apply to parity. And none of the past or planned speech that the plaintiffs want to engage in is thus caught up in the scope of the statute. And second, there is no substantial risk of imminent enforcement, given that both of the enforcement authorities before you here, the Minnesota Attorney General, the Douglas County Attorney, are telling this Court that they do not interpret this statute to apply to any of the past or planned speech that was put in the preliminary injunction. Of course, the word parity is not in the statute. It's in many other State statutes that try to accomplish the same thing. So should we even talk about parity? Should we even mention it? I think that the Court should conclude that parity is categorically excluded from the statute. And I think you should do it for this reason, Judge Benton. If you look at subdivision 1C1 of the statute, it defines deepfake. And it defines deepfake as basically content that is so realistic that a reasonable person would believe that it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct. That tracks the constitutional definition of parity, because parity for constitutional purposes is basically content that can't be interpreted as stating actual facts about someone. So Judge Provenzino 100 percent got the statute right. The statute just by its plain terms does not apply to parity. It only reaches those deepfakes that would fundamentally alter someone's perception of reality. The trouble with that is it's a lawyer's definition of parity. It's not a practical. I mean, parity is oriented toward real facts. Judge Loken, I agree. This is not an easy thing conceptually for me. No, I'm sorry. I didn't mean to interrupt you. But I would just say on that it may be a lawyer's definition, but it's also the Supreme Court's definition of parity. And what the legislature did here was track that definition and in doing so categorically exclude parity from the statute's scope. You know, another group of lawyers and politicians placing overemphasis on Supreme Court dicta, which the Supreme Court tells all of us not to be aware of. And that's what we're talking about here, I think. We don't have a Supreme Court case on point. I think Judge Provenzino cites the cases that do support our reading of the statute. Well, she says that as to images that are labeled. Right. But there's another layer then of what would a person in the audience understand this to be. Right. If the person wouldn't understand it to be a parity and would be confused and think that this is the actual person saying something outrageous, as sometimes happens in politics, then it wouldn't necessarily fall under your definition. Let me just make two very quick points on that, Judge Colleton. I think the sequencing of the analysis that Judge Provenzino did was she looked at the statute and said it excludes parity. And then with respect to Francis, he said, look, the video that she re-shared didn't have that parity label. And so a reasonable person could believe that maybe it depicted Kamala Harris saying something that she didn't do. I think that's not right. And I think it's not right because this is a rare instance where Judge Provenzino went astray in this order. She says that the re-sharing fell within the scope of the statute because a reasonable person could believe that it depicted Kamala Harris' speech or conduct. But what Minnesota statute says, it requires content that's so realistic that a reasonable person would believe. And we think that would makes a difference. But even if I don't have you on the statutory interpretation question, there is no substantial risk of enforcement here. And I think that is dispositive of the standing question. I mean, the plaintiffs also have to show a credible threat of enforcement. And we are saying the enforcement — What cases say we go by what the county attorney says in some pleading? Where did the county attorney say there would be no enforcement? In what context? The Douglas County attorney put in a declaration saying that they had no present intention of enforcing the statute. No present intention. Well, it could change any day depending on the next video. Well, but I do think, Judge Colleton, what we are saying here is even stronger than what you see in some of these typical cases where, you know, you have a statute that, like, the Attorney General thinks applies and we put in some affidavit that says, but we're not going to apply it to this person. We are saying that the statute categorically excludes all of the parodies, the past or planned speech that the plaintiffs say that they want to engage in. And we think that is powerful evidence that there is no substantial risk of enforcement here. And we think that's reinforced by the fact that the plaintiffs here — What's the evidence? And how is that — where is it in the record? And how do we rely on it? So I would point to a couple. So the evidence in the record that there's only parodies that they want to engage in is both the July 26th video and also in the evidentiary record. Now the county attorney doesn't take your view or doesn't agree with your interpretation or the Supreme Court's interpretation or the last man on the street's interpretation of parody. And besides, I don't like — I don't like this one. I'm going — this one, they can call it parody, but I'm calling it a violation. We think that would be at war with the language of the statute, and the statute categorically excludes parody from its sweep. But what reinforces that conclusion here, Judge Loken, is that the plaintiffs here are not self-censoring in any way. They also do not understand the statute to be applying to their speech. I mean, one of the things that you typically see in these First Amendment pre-enforcement facial challenges is some sort of allegation that the plaintiffs are modifying their speech. And you don't have that here in any way. The plaintiffs are completely undeterred. They expressly allege that in their complaint. If you look at paragraph 37, paragraphs 4, paragraph 16, Representative Franson is talking about how she regularly communicates with her constituents on social media and how, you know, even if some naysayers don't like the jokes that she shares, she's going to continue to do so. And on top of that, there was evidence in the record that we put in that showed that even after this law went into effect, the plaintiffs were completely undeterred. And the plaintiffs didn't even really contest that point at the district court. They pretty much argued that Franson and Coles are iconoclasts and that this statute is not, in fact, deterring their speech. And so on this record, we think this case is more like School of the Ozarks versus Biden, which is a decision I believe you wrote, Judge Colleton, where the court concluded that the Christian college there that said it was concerned about enforcement of the Fair Housing Act, there was no First Amendment standing because the college had not self-censored in any way. They said they were going to continue spreading the message that they wanted to spread. Even more, wasn't it true in that case that the federal government said they weren't going to enforce it against them? Yes. I thought that was a fact.  Yes. I've only got a little bit of time left here, so I do just want to pivot back to irreparable harm just for a minute or two. Yes. What about this delay idea? As you know, the other side says, well, the delay is not a valid basis for denying irreparable harm. I don't think that can be squared with this Court's decision in Hotchkiss, where this Court said that even in a First Amendment pre-enforcement case, delay can be — well, let me take a step back. What this Court said was irreparable harm can be a sufficient reason standing alone to deny the extraordinary remedy of a preliminary injunction. And there, one of the factors that the district court had considered in its equitable discretion was that the plaintiff had waited 16 months to sue. You have about the same gap here. And so we think that delay is relevant to the inquiry, that delay can show a lack of diligence, which suggests a lack of irreparable harm. That is a context-dependent inquiry. That's what the Court said in the University of Minnesota Board of Regents case. And the context here underscores that the delay was not reasonable, even if the Court concludes that Franzen had standing, because, again, this is a facial challenge to a law that she originally voted for. And so there's no credible claim that she is unaware of the law's scope, given those facts. Unless the Court has any further questions, I will cede the balance of my time. Okay. Thank you for your argument. We'll hear rebuttal. Mr. Shulman. Thank you, Your Honors. I guess I'll return to irreparable harm, since that's where the discussion seems to be. And on that question, I'll point this Court back to a case we cited, NGEB Board of Regents, where it said that the length of delay is not determinative, and it's only unreasonable when it's no longer possible to preserve the status quo. There's no challenge here that that standard is met. We've cited several other cases where a delay, and I don't believe the other side has cited a single First Amendment constitutional case where this, the term of delay from the statute, even if you want to consider the space from the first statute, which, of course, for Ms. Franzen, didn't have the possibility of disqualifying her from holding office, that statute didn't come into effect until July 2024, which was just a three-month delay before the filing of the suit. What about this question of chill? Is there any evidence of chill? There is evidence of chill on us and on third parties, both of which. And, of course, as part of the complaint, we alleged that the limiting of the reach of the followers of Mr. Cole. So on some of the What's the evidence of chill? Mr. Farrell just said there was no chill.  So we cite this at page 8 of the reply brief, the paragraphs of our complaint that we allege that they reasonably feared a prosecution. Now, that didn't, of course, silence them, though. They can have a reasonable fear without fully silencing themselves. Well, that's what I'm asking. Did they self-censor or did they continue to speak and say, we're willing to endure the prosecution that we reasonably fear, according to our complaint? Right. They continued to speak. And, of course, this circuit's precedent for fiscal accountability v. Claire says that there's two ways to establish pre-enforcement First Amendment standing. One, you go through the SBA list test where you're arguably prescribed. You intend to engage in a course of conduct that's arguably prescribed. Or, two, you engage in full self-censorship, which they haven't done, though we allege that Plano-Fransen knows of other representatives that have engaged in full self-censorship, which affects our clients in terms of limiting the reach of their speech. It limits the reach of speech that they wish to see and will be unable to because of the self-censorship of other individuals. That was paragraph 35 of the complaint where we allege that. And the complaint, of course, was verified, so this is all evidence, unlike the representations in documents that what we want, that parity is excluded, right? There's no declaration that either defendant put onto the record that says that this is our official view of the agency, that this is excluded. I thought he said the county attorney put in a declaration. That we have no present intent, right? That's the declaratory evidence in this case. Otherwise, we just have the litigating position, which this Court has said in Rogers v. Bryant, adopting an expedient litigation position doesn't suffice to undermine the credible threat of enforcement of a newly promulgated statute, at the very least. One other thing I heard from the other side was that the district court erred by applying to find standing for mistrans in applying reasonable people could believe rather than would believe. Well, the could believe comes, obviously, from the arguably prescribed. If she applied a would believe, it would be an actually prescribed test, which is not what this Court's precedence, it's not what SBA lists, commands. I'm happy to answer other questions the Court may have. If not, I'll rest on that. Very well. Thank you for your argument. Thank you. Thank you to all counsel. The case is submitted and the Court will file a decision in due course.